David L. WOMACK, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–1548.

District of Columbia Court of Appeals.

Argued Sept. 11, 1995.
Decided March 14, 1996.

Jon W. Norris, Public Defender Service, with whom James Klein and Gretchen Franklin, Public Defender Service, were on the brief, for appellant.

Nancy B. Bukas, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Patricia Stewart, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

Opinion for the court by Associate Judge SCHWELB.

Dissenting opinion by Associate Judge RUIZ at p. 614.

SCHWELB, Associate Judge:

On August 10, 1993, following the denial of his motion to suppress an out-of-court identification, tangible evidence, and statements, appellant David Womack was convicted of rape while armed,[1] possession of a firearm during a crime of violence or a dangerous offense,[2] two counts of first-degree burglary while armed,[3] two counts of kidnapping while armed,[4] and three counts of armed robbery.[5] On appeal, Womack contends that he was arrested without probable cause and that the trial judge erred in denying his motion to suppress the alleged fruits of that arrest. Although Womack concedes that his initial seizure by police was lawful, he claims that the officers' action in handcuffing him exceeded the scope of a legitimate investigative detention and transformed the encounter into a full arrest requiring probable cause. The motions judge concluded that the seizure of Womack was effected to enable the complaining witness to identify him, and that it therefore constituted an investigative detention pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), rather than a full arrest. We agree and affirm.

1. D.C.Code §§ 22–2801, –3202 (1989 & 1995 Supp.).

2. D.C.Code § 22–3204(b) (1995 Supp.).

3. D.C.Code §§ 22–1801(a), –3202 (1989 & 1995 Supp.).

4. D.C.Code §§ 22–2101, –3202 (1989 & 1995 Supp.).

5. D.C.Code §§ 22–2901, –3202 (1989 & 1995 Supp.).

## I.

### STATEMENT OF FACTS

Following an evidentiary hearing at which several police officers and the defendant's grandmother testified, the motions judge denied Womack's motion to suppress and made oral findings as set forth below. On the night of November 29, 1992, at about 11:00 p.m., the complaining witness, N.H.,[6] was confronted at her home by a man who was armed with a handgun and whose face was covered by some type of hood or scarf. N.H. was in the intruder's presence for up to two hours, during which time he raped her and committed a number of other unlawful acts.[7] Although she was blindfolded for some of that time, N.H. was able to recognize her assailant based on his features and a scar around his left eye, which she could see through the eye holes in the attacker's face covering.

N.H. called the police immediately after her assailant left. She advised the police that she believed that the man who had raped her was someone whom she had known since June 1992 as "D." N.H. related that she did not know "D's" full name, but that she had gone out with him on one occasion, and that she believed that he lived in the area. N.H. also gave the police a photograph of the man she knew as "D."

Based on statements made by the attacker to N.H. as related by N.H. to the police, the officers had reason to believe that one of N.H.'s friends might know the man's name and address. The friend was unable to provide the police with a full name, but she gave the officers two telephone numbers for the individual whom she knew as "D." The police, using a Haines or a Criss–Cross Directory, traced one of the telephone numbers to an address on Taylor Street in northwest Washington, D.C. This address turned out to be the home of Womack's grandmother, Ms. Sylvia Steele.

The officers went to Ms. Steele's home approximately two to three hours after the assault ended.[8] Ms. Steele answered the door and invited them into the house. One of the officers asked her whether or not she had a son named "D." Ms. Steele responded that she did not have a son named "D," but that she had a grandson named David.[9] The motions judge concluded that, based on this conversation, it was reasonable for the officers to believe that Ms. Steele recognized the name "D" and that Ms. Steele's grandson, David, was the individual known as "D."

After the officers' inquiry about "D," Ms. Steele called to her grandson to come downstairs. Womack, who was wearing sleeping attire, came down the steps. Detective Cobel placed handcuffs on Womack and took him outside the house to the porch. N.H., who was seated in a patrol car approximately thirty-five feet from the house, positively identified Womack as her assailant, and he was formally placed under arrest.

After the show-up identification, Ms. Steele went upstairs to retrieve clothing for her grandson. She brought down, among other things, a pair of boots. In her statement to the police, N.H. had described the

---

6. In order to preserve the complainant's privacy, we identify her only by initials.

7. According to the testimony of Detective Tyson Cobel at the suppression hearing, the following events occurred during this two-hour period. The intruder woke N.H. in her bed, covered her mouth with his hand, and told her to "shut up" and "not to say anything or he would kill her." He forced N.H. to have sexual intercourse with him on the floor of her bedroom. He later ordered N.H. into her mother's bedroom, where he demanded that the mother give him money. The attacker ordered both women into the basement and forced the mother to tie up and blindfold her daughter. He then forced the mother to drive to an ATM machine and withdraw four hundred dollars. When they returned to the house, the attacker ordered N.H. to take a bath. Finally, to eliminate his fingerprints, he forced both women to wash all the surfaces in the house and car that he believed he had touched.

8. The police arrived at the Taylor Street address at approximately 4:00 a.m. According to Ms. Steele's testimony at the suppression hearing, Detective Cobel was accompanied by two additional police officers when he knocked on her door.

9. Although her son Darrell also resided at the Taylor Street address, Ms. Steele referred to her grandson, David Womack, and not to her son, Darrell, in response to the officer's inquiry about "D."

rapist's boots, and Detective Cobel suspected that the boots which Ms. Steele had brought might be the pair that N.H. had previously described. The officers told Ms. Steele that she would have to get some other shoes for Womack, and they seized the boots as evidence.

Having found the facts as described above, the motions judge ruled that, at the point when Womack came downstairs, the officers had reasonable and articulable suspicion that Womack was N.H.'s assailant. The judge found that the officers were legitimately on the premises by the invitation of Ms. Steele, and that the show-up procedure was reasonable because it would either clear Womack of suspicion or confirm that the police had found the right man. The judge specifically ruled that the police did not have probable cause to make an arrest before the show-up identification, but he concluded that articulable suspicion was sufficient at that stage. The judge held—and it is undisputed—that after N.H. had positively identified Womack, the police had probable cause to arrest him. The judge therefore denied Womack's motion to suppress the out-of-court identification, the tangible evidence (including his boots), and certain statements which Womack made at the police station. Womack was tried and convicted as noted above, and this appeal followed.

## II.

### LEGAL DISCUSSION

*A. Scope of Review.*

■ On appeal from the denial of a motion to suppress, the scope of our review is limited. *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991); *Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989). We must defer to the trial judge's findings of evidentiary fact. *Lawrence, supra,* 566 A.2d at 60. We view the evidence presented at the suppression hearing in the light most favorable to the party prevailing below, and we draw all reasonable inferences in that party's favor. *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc); *United States v. Pannell,* 383 A.2d 1078, 1080 (D.C.1978). Whether the evidence, as found by the mo-

tions judge, establishes that Womack was seized in violation of his Fourth Amendment rights is a question of law, which we consider *de novo. See Brown, supra,* 590 A.2d at 1020.

*B. Reasonableness, Proportionality, and the Fourth Amendment.*

Womack's claims in this case are grounded in the Fourth Amendment exclusionary rule, which vindicates the constitutional proscription against unreasonable searches and seizures. The basic question presented is whether, under all of the circumstances, the seizure and handcuffing of Womack were reasonable.

■ We do not assess reasonableness in a vacuum. The risk to the safety of the officers might not seem very great to a judge reviewing a transcript years after the fact, but the situation may reasonably have appeared far more dangerous to an officer who had just come into contact with a suspect in an armed rape and kidnapping which occurred only hours before. The evidence must be "weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

> Even though we, sitting in the relative calm of a court or library, may have concluded otherwise, we are bound to give deference to the officer's decision if it was reasonable under the facts as viewed by him.

*Arrington v. United States,* 311 A.2d 838, 839 (D.C.1973).

■ When courts are called upon to decide whether the force used by an officer to restrain a suspect was excessive, "[t]he calculus of reasonableness must [also] embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). When Detective Cobel and his colleagues arrived at Ms. Steele's home and saw a sus-

pected armed rapist and kidnapper coming downstairs, they had to act immediately, without the luxury of extended thoughtful reflection regarding the question whether it would be absolutely necessary to place the suspect in handcuffs. From the officers' perspective—not an unreasonable one—it was better to be safe than sorry.

■ The use in the Fourth Amendment of the adjective "unreasonable" imports a command of proportionality to that Amendment's jurisprudence. *Brown, supra,* 590 A.2d at 1013. The greater the restriction on the seized individual's liberty, the more substantial the justification for such a restriction must be. "A lesser intrusion, on the other hand, requires a correspondingly lesser showing." *Id.*

■ We must also accord appropriate weight to the safety of the officers, as well as to their obligation to assure that a dangerous suspect does not flee. We recently adopted as our own these compelling words written by Judge Harold Leventhal:

> As a society, we routinely expect police officers to risk their lives in apprehending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking.

*Cousart v. United States,* 618 A.2d 96, 101 (D.C.1992) (en banc), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1878, 123 L.Ed.2d 496 (1993) (quoting *Bailey v. United States,* 128 U.S.App.D.C. 354, 364, 389 F.2d 305, 315 (1967) (concurring opinion)). Where the intrusion upon the suspect's liberty is comparatively minor and of brief duration, officers are not constitutionally compelled to take even a modest risk of harm.

*C. Terry Seizures, Arrests, and the Handcuffing of Suspects.*

■ In *Terry,* the Supreme Court held that, consistent with the Fourth Amendment, the police may briefly detain an individual for investigative purposes, even if they lack probable cause to arrest, so long as the officers have a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. 392 U.S. at 21–22,

88 S.Ct. at 1879–81. *Terry* thus carved out a narrow exception to the Fourth Amendment's probable cause requirement. To come within the purview of the *Terry* exception, police action must be justified at its inception, and must also be reasonably related in scope to the circumstances which initially justified the detention. *Id.* at 19–20, 88 S.Ct. at 1878–79. Thus, when officers subject a detained suspect to a greater restraint on his liberty than is permissible in a legitimate *Terry* seizure, articulable suspicion is not sufficient, and the Constitution requires a showing of probable cause. *See, e.g., In re M.E.B.,* 638 A.2d 1123, 1126 (D.C.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 221, 130 L.Ed.2d 148 (1994).

The question presented in this case is whether the use of handcuffs, which is a familiar feature of arrests, precluded the judge from finding that the seizure was no more than a permissible *Terry* stop. In *M.E.B.,* which also involved the handcuffing of suspects prior to a show-up identification, we described the difference between a full arrest and a *Terry* seizure in terms of their distinct purposes:

> Generally, an arrest is effected when the police have made a determination to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court.... A *Terry* seizure, on the other hand, involves a more temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect.

*Id.* (citations omitted).

■ "The measure of the scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances." *Id.* at 1127 (citing *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985)). "[H]andcuffing the detainee, like length of detention, place of detention, and other considerations, is simply one factor, among many, that the trial judge must consider in weighing whether a deten-

tion for investigation crossed the line into the realm of arrest." *Id.* at 1128.

In *M.E.B.*, the appellant and another individual were detained by two police officers because they matched a radio description of two men seen at the site of a murder. *Id.* at 1124–25. The two suspects were handcuffed, placed in the rear of a police vehicle, and transported to other locations for identification. The entire detention lasted between twelve and seventeen minutes. *Id.* at 1127. The appellant contended that the handcuffing was unnecessary and that it converted the seizure into a full arrest. This court disagreed. We held that, given the seriousness of the crime under investigation, the brevity of the detention, and the fact that the suspects were to be transported in a patrol car for several blocks, "handcuffing was a reasonable precaution under the circumstances." *Id.* at 1128. We reiterated that the "protection of the officer making the stop ... is of paramount importance. It has been called the rationale of *Terry.*" *Id.* at 1127 (quoting *United States v. Mason,* 450 A.2d 464, 466 (D.C.1982) (per curiam)).

Decisions in other jurisdictions are to the same effect. As we noted in *M.E.B.*, courts generally have approved the use of handcuffs "where it was reasonably necessary to protect the officers' safety or to thwart a suspect's attempt to flee." *Id.* at 1128 (quoting *Reynolds v. State,* 592 So.2d 1082, 1084 (Fla. 1992)); *see also United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir.1982) ("police conducting on-the-scene investigations involving potentially dangerous suspects may take precautionary measures if they are reasonably necessary"), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983); *People v. Weeams,* 665 P.2d 619, 622 (Colo. 1983) (en banc) ("Officers conducting an investigatory stop may use that amount of force which is reasonably related in scope and character to ensuring their safety during the period of detention.").

▮ The foregoing standard is an objective one. The question is whether the hand-

cuffing of the suspect was an "*objectively* reasonable use of force in light of the totality of the circumstances." *Tom v. Voida,* 963 F.2d 952, 958 (7th Cir.1992) (emphasis added); *see also Graham, supra,* 490 U.S. at 397, 109 S.Ct. at 1872–73. To determine if the Fourth Amendment was violated, the court must decide "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham, supra,* 490 U.S. at 397, 109 S.Ct. at 1872. Thus, whether police officers in fact feared for their safety during an encounter with a suspect is not dispositive.[10] The critical question is whether a reasonably prudent officer would have been justified in using handcuffs to neutralize potential threats to his or her safety or to inhibit any attempt by the suspect to escape.

Courts have routinely held the use of handcuffs in the *Terry* context to be reasonable in situations where suspects attempted to resist police, made furtive gestures, ignored police commands, attempted to flee, or otherwise frustrated police inquiry. *See, e.g., United States v. Taylor,* 716 F.2d 701, 709 (9th Cir.1983); *Bautista, supra,* 684 F.2d at 1289; *United States v. Purry,* 178 U.S.App. D.C. 139, 141–42, 545 F.2d 217, 219–20 (1976); 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.2(d), at 366–67 (2d ed. 1987 & 1995 Supp.). Such conduct on the part of a particular suspect is not, however, a *sine qua non.* Indeed, there was no evidence in *M.E.B.* that either suspect did anything untoward after the two young men were detained. We nevertheless concluded in that case that " 'the handcuffing of [defendant] was reasonable, as a corollary of the lawful [*Terry* ] stop,' in order to maintain the status quo while the officer sought more information." 638 A.2d at 1128 (quoting *Purry, supra,* 178 U.S.App.D.C. at 142, 545 F.2d at 220) (alteration in original). Other courts have likewise held that the use of handcuffs was justified where, as here, the crime of

---

10. Detective Cobel was not asked whether he felt threatened during his encounter with Womack. Although inquiry into this subject might have been helpful to explain the context of the encoun-

ter from Cobel's point of view, the cited authorities establish that the lack of such testimony does not negate the motions judge's finding.

which the defendant was suspected was a violent one and the defendant was reported to have been armed. *See, e.g., United States v. Tilmon,* 19 F.3d 1221, 1228 & n. 4 (7th Cir.1994) ("handcuffing—once highly problematical—is becoming quite acceptable in the context of a *Terry* analysis"); *Weeams, supra,* 665 P.2d at 622; *People v. Allen,* 73 N.Y.2d 378, 540 N.Y.S.2d 971, 971–72, 538 N.E.2d 323, 323–24 (1989) (per curiam).

### D. The Seizure of Womack.

We conclude that the foregoing authorities compel us to affirm the trial court's decision. This is not a case in which the police had decided, prior to Womack's identification by N.H., to take him into custody and charge him with a crime—the conventional scenario when police make an arrest. *M.E.B., supra,* 638 A.2d at 1126. On the contrary, the police were effecting a "temporary detention, designed to last only until a preliminary investigation [here, the show-up identification procedure] either generate[d] probable cause or result[ed] in the release of the suspect." *Id.* See also *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983), in which the Court noted that if the officers had used a more expeditious investigative procedure consistent with *Terry,* rather than ushering Royer to an interrogation room for questioning, "[a] negative result would have freed Royer in short order; [while discovery of contraband] would have resulted in his justifiable arrest on probable cause." Detective Cobel testified on direct examination that "once Mr. Womack was identified, he was *then* placed under arrest." (Emphasis added). The motions judge evidently credited his testimony.[11] Putting to one side the legal issue presented

by the handcuffing, the detention of Womack prior to N.H.'s identification of him constituted the classic—perhaps even paradigmatic—*Terry* seizure. Womack concedes, and the motions judge found, that the officers had articulable suspicion in the *Terry* sense.

We conclude that the handcuffing of Womack did not change the result. The incremental intrusion on Womack's liberty effected by the handcuffs was minimal. Even if Womack had not been placed in handcuffs, he would not have been free to leave until after N.H. had had an opportunity to identify him. The time that elapsed from the moment that he was handcuffed until the identification procedure was completed was, at most, a few minutes. The sum total of the restraint on Womack's freedom now alleged to be excessive boils down to the complaint that, during a concededly lawful detention by the police, he was in handcuffs for a very short time.[12]

Like the motions judge, we are not disposed to second-guess the officers who were on the scene with respect to a comparatively modest security measure which had only a brief and minimal effect on Womack's freedom of action. The authorities cited in Part II.B of this opinion require us to consider the issue from the perspective of a reasonably prudent officer who had just arrived on the scene. The officers in this case were on Womack's home turf. Womack was suspected of having committed violent and extremely serious crimes, including rape, kidnapping, and robbery, all while armed with a handgun. These offenses had been completed only a few hours earlier. The officers were not acquainted with Womack or with his family. They had no idea where his handgun might

---

**11.** On cross-examination, Cobel was asked: "And you didn't actually arrest Mr. Womack until you placed the handcuffs on him, right?" Detective Cobel responded: "Correct." Given the detective's testimony on direct examination, it appears that he may have treated the word "until" as meaning "before" or "prior to." In any event, viewing the evidence, as we must, in the light most favorable to the prosecution, *Peay, supra,* 597 A.2d at 1320, we treat Cobel's testimony as supporting the judge's finding that the arrest came after the identification, not before.

**12.** Significantly, the pre-identification period during which Womack was in handcuffs was far

shorter than the corresponding period for the appellant in *M.E.B.,* a case in which we held that the handcuffing did not convert the *Terry* seizure into an arrest. It goes without saying that this case "involve[s] neither the inconvenience nor the indignity associated with a compelled visit to the police station," *Michigan v. Summers,* 452 U.S. 692, 702, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981), and is therefore unlike both *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), on which Judge Ruiz repeatedly relies.

be, or whether there were other individuals on the scene who might endeavor to thwart his apprehension. The complaining witness was outside, and it would be necessary to take the suspect out on the porch so that an identification could be accomplished; it would obviously have been easier for him to attempt to escape from the porch than from inside the house.[13] All of these circumstances could lead a reasonably prudent police officer to believe that, in the interest of safety, the most reasonable course of action would be to handcuff Womack, at least until N.H. could determine whether he was the right man.

It may be that, in the relative calm of his or her chambers, years after the fact, a judge might reasonably conclude that the risk that Womack would harm the officers or would flee was not very great. But especially in this area of the law, second-guessing of split-second decisions made by the officers on the scene is fraught with peril, and every effort must be made to "eliminate the distorting effects of hindsight." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

On the night in question, Detective Cobel and his colleagues had no idea of what might happen when they entered the house, nor could they foresee what a man suspected of armed rape and kidnapping might try to do to avoid apprehension. From their perspective, even a modest risk would reasonably appear altogether unacceptable. To hold, as Womack demands, that the handcuffing in this case was unreasonable and unconstitutional would be to require police officers confronting potentially dangerous suspects in unfamiliar surroundings to jeopardize their own safety, and the safety of the public, in order to avoid only a very brief and minimal incremental restraint on the liberty of a sus-

pect who has already been legitimately detained. Such a result would be entirely out of keeping with the command of proportionality which is central to our Fourth Amendment jurisprudence. *Brown, supra*, 590 A.2d at 1013.

## III.

### RESPONSE TO DISSENT

#### A. Seizure in the Home.

Judge Ruiz bases her dissenting opinion largely on the fact that Womack was seized in the home in which he lived with his grandmother. She maintains that "the exception to the constitutional probable cause requirement established in *Terry v. Ohio*, [*supra* ], do[es] not easily extend to seizures in one's home." Dissenting op. at 615. She asserts that a felony arrest based on probable cause, when effected in a public place, is a recognized exception to the Fourth Amendment's warrant requirement, but that "the Supreme Court has not been similarly tolerant of seizures of suspects occurring in the suspect's home." *Id.* at 618. Further, according to Judge Ruiz, "[t]he fact that the seizure occurred in Womack's home ... undermines, rather than helps justify, the police's use of handcuffs under the circumstances presented in this case."[14] *Id.* at 629. The point Judge Ruiz raises is an interesting one, but it is not properly before us.

Womack did not base his suppression motion or his appeal on any claim relating to the "respect for the sanctity of the home." The principle that animates Judge Ruiz' opinion—namely, that the *Terry* doctrine does not apply, or applies with substantially less force, to seizures in a home which officers have entered with the homeowner's consent—was introduced into this case by our dissenting colleague. Womack, who is repre-

---

**13.** Detective Cobel also testified that Womack "attempted to resist," but it is not at all clear from his testimony that this occurred prior to the handcuffing. The motions judge made no finding on the issue and, because the prosecutor failed to "nail down" the timing, this testimony should be accorded little if any weight.

**14.** Indeed, Judge Ruiz quotes from a famous address by a British prime minister in which he insisted that even the King of England cannot

enter a poor man's frail cottage without the poor man's consent. Dissenting op. at —— n. 7 (quoting *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 1194–95, 2 L.Ed.2d 1332 (1958)). The principle is a noble one, but its application to the present case must surely be tempered by the undisputed fact, recognized by Judge Ruiz, that the officers entered the home with the consent of its owner, Womack's grandmother.

sented in this case by able counsel from the Public Defender Service, did not include such a contention—we will call it the "diminished *Terry* exception" claim [15]—in his motion to suppress, in his brief on appeal, in his reply brief, or at oral argument. He cited none of the cases on which Judge Ruiz relies for her "diminished *Terry* exception" theory. Indeed, Womack relied in his brief on decisions addressing *Terry*-type issues which arose at a Greyhound bus station,[16] during a traffic stop,[17] on the street,[18] and, in one case, in an apartment,[19] without any suggestion that greater restrictions should be placed on the police where the seizure followed a consensual entry into a home. Furthermore, in the memorandum in support of his motion to suppress, Womack asserted in the trial court that, according to *Terry*, the Fourth Amendment right to be free from unreasonable searches and seizures "belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." 392 U.S. at 8–9, 88 S.Ct. at 1873. He thus equated a seizure in the home with a seizure on the street, and thereby affirmatively invited the purported error which our dissenting colleague finds in the trial court's disposition. *See District of Columbia v. Wical Ltd. Partnership*, 630 A.2d 174, 182–83 (D.C.1993) (discussing "invited error" doctrine).

Under these circumstances, the "diminished *Terry* exception" claim has not been preserved. "Questions not properly raised and preserved during the proceedings under examination, *and points not asserted with sufficient precision to indicate distinctly the party's thesis*, will normally be spurned on appeal." *Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967) (emphasis added) (footnotes omitted). Even if Womack had raised the issue in this court, which he did not, he would have to demonstrate that the trial judge committed plain error (or, indeed, invited error) by failing, on his own initiative, to grant the motion to suppress on the basis of a theory which was not presented to him by the defense. *See, e.g., Irick v. United States*, 565 A.2d 26, 32–33 (D.C.1989). To establish plain error, Womack would have to show that the application of conventional *Terry* principles in a seizure following a consensual entry into a home was "obviously" wrong, and that the failure of the judge, *sua sponte*, to adopt the "diminished *Terry* exception" theory would result in a clear miscarriage of justice. *See Baxter v. United States*, 640 A.2d 714, 717 (D.C.1994) (citing *United States v. Olano*, 507 U.S. 725, 730–37, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508 (1993)). Because the correctness of that theory is anything but obvious,[20] and because the result in this case is not unjust,[21] Womack would not have even a

15. We use this phrase solely as an abbreviated reference to Judge Ruiz' contention that the officers were subject to greater constraints in the home of Womack's grandmother than they would have faced if the encounter had occurred on the street.

16. *See United States v. Jones*, 297 U.S.App.D.C. 356, 973 F.2d 928 (1992).

17. *See United States v. Thompson*, 597 F.2d 187 (9th Cir.1979).

18. *See Terry, supra*.

19. *See Prophet v. United States*, 602 A.2d 1087 (D.C.1992).

20. Because the parties have neither briefed nor argued the issue, the present case is not the appropriate occasion to debate the merits of the "diminished *Terry* exception" theory. We note only that "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investi-

gatory encounter." *Maryland v. Buie*, 494 U.S. 325, 333, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990). Our dissenting colleague's observation to the contrary notwithstanding, the truth of this common-sense observation cannot logically depend on whether the police are effecting an arrest or a more limited seizure. *See also Michigan v. Summers, supra*, 452 U.S. at 700–05, 101 S.Ct. at 2593–96 (discussing applicability of *Terry* principles to the detention of a defendant in his home pending a search pursuant to a warrant); *see also United States v. Brooks*, 2 F.3d 838, 841–42 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1117, 127 L.Ed.2d 427 (1994) (applying *Terry* standards "following a consensual or otherwise lawful entry into a private dwelling"); *Hill v. United States*, 664 A.2d 347, 354 (D.C.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 749, 133 L.Ed.2d 697 (1996) (citing *Summers* and *Brooks* ).

21. As we have noted in Part II. of this opinion, the sole claimed intrusion was the handcuffing of Womack for, at most, a few minutes, at a time when he was concededly lawfully detained.

remote prospect of sustaining his burden under the plain error doctrine.

█ But even the "plain error" scenario is more favorable to Womack than the present record. Here, Womack failed to present his "diminished *Terry* exception" claim not only in the trial court, but also on appeal. Where counsel has made no attempt to address an issue, an appellate court will generally decline to consider it. *Rose v. United States*, 629 A.2d 526, 536 (D.C.1993); *Carducci v. Regan*, 230 U.S.App.D.C. 80, 86, 714 F.2d 171, 177 (1983). As Judge (now Justice) Scalia reiterated in *Carducci,*

> [t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.

*Id.; accord, Rose,* 629 A.2d at 536–37 (quoting *Carducci* ).[22] The "diminished *Terry* exception" issue has not been briefed by counsel. The government has never had any occasion or opportunity to address it.[23] Accordingly, we decline to consider it.[24]

## B. "Least Intrusive Means."

█ Our dissenting colleague refers to the government's obligation, under these circumstances, to "use the least intrusive means reasonable in light of the facts before the officers." Dissenting op. at 620.[25] Whether handcuffing was the "least intrusive" alternative available to the officers, however, is not the appropriate Fourth Amendment inquiry. Indeed, the Supreme Court has repeatedly rejected this type of analysis. "The logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." *United States v. Martinez–Fuerte,* 428 U.S. 543, 556–57 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976); *see also Bell v. Wolfish,* 441 U.S. 520, 559–60 n. 40, 99 S.Ct. 1861, 1885 n. 40, 60 L.Ed.2d 447 (1979); *United States v. Montoya De Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985). "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *Sharpe, supra,* 470 U.S. at 686–87, 105 S.Ct. at 1575–76. "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search [or seizure] unreasonable." *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); *see also Sharpe, supra,* 470 U.S. at 687, 105 S.Ct. at 1576 (quoting *Cady*);

---

**22.** In *Carducci,* the court lucidly explicated the reasons for this premise:

> Rule 28(a)(4) of the Federal Rules of Appellate Procedure requires that the appellant's brief contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Failure to enforce this requirement will ultimately deprive us in substantial measure of that assistance of counsel which the system assumes—a deficiency that we can perhaps supply by other means, but not without altering the character of our institution. Of course not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel through our own deliberation and research. *But where counsel has made no attempt to address the issue, we will not remedy the defect, especially where, as here, "important questions of far-reaching significance" are involved.*

230 U.S.App.D.C. at 86, 714 F.2d at 177 (emphasis added) (citations omitted).

**23.** Our dissenting colleague complains that the government "did not cite any case, from any jurisdiction" refuting the "diminished *Terry* exception" theory. Dissenting op. at 622. We do not believe that a party can reasonably be faulted for failing to address an issue which its adversary conceded in the trial court and never raised on appeal.

**24.** Judge Ruiz also asserts that "this case does not present a true *Terry* stop [because] ... [t]he officers ... were investigating a completed crime, rather than observing ongoing criminal activity...." Dissenting op. at 621. This issue, like the "diminished *Terry* exception" claim, was never raised or argued by Womack. Moreover, in *M.E.B.,* as in this case, the officers were investigating a completed crime, but their seizure of the suspects and the use of handcuffs were sustained as a legitimate *Terry* stop.

**25.** Judge Ruiz points out that the officers did not frisk Womack before handcuffing him, but "even a frisk does not ensure that weapons will be discovered." *M.E.B., supra,* 638 A.2d at 1127–28 (citing authorities).

*Tilmon, supra,* 19 F.3d at 1225 (explaining the "least intrusive means" language in *Florida v. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325–26, on which Judge Ruiz relies).

As Professor LaFave has indicated, "a 'least intrusive means' inquiry has a great potential for mischief. It is likely to result in unrealistic second-guessing of the police." 3 LaFave, *supra,* § 9.2(f), at 389. We have concluded that the handcuffing of Womack was a reasonable seizure permitted by the Fourth Amendment. This being the decisive issue, we decline to engage in the kind of armchair quarterbacking against which the Supreme Court has warned.

### C. "Appellate Fact–Finding."

Judge Ruiz asserts that the majority has engaged in "*de novo* fact-finding to justify its reasoning where the government has failed to prove its case." Dissenting op. at 630. She complains that we have "observ[ed] without support in the record" that the officers "had no idea where Womack's handgun might be, or whether there were other individuals on the scene who might endeavor to thwart his apprehension." We respectfully disagree with our dissenting colleague's characterization.

The motions judge having denied Womack's motion to suppress, we must view the evidence, and all reasonable inferences from the evidence, in the light most favorable to the government. *See Pannell, supra,* 383 A.2d at 1080. Moreover, "[w]hen we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men [or women]." *Poulnot v. District of Columbia,* 608 A.2d 134, 141 (D.C.1992) (quoting *Edwards v. Habib,* 130 U.S.App.D.C. 126, 140, 397 F.2d 687,

701 (1968), *cert. denied,* 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969)) (second alteration in original). Black robes are not supposed to eviscerate our common sense.

The record discloses that the officers came to the home owned by Womack's grandmother only a few hours after the commission of a brutal armed rape and kidnapping. The officers had reason to suspect that Womack was the man responsible. There is absolutely nothing in the record to suggest, if Womack was indeed the guilty party, how the officers could have had any information regarding the location of Womack's handgun, or whether he might have received assistance from others if the officers attempted to take him into custody. How could they possibly have known? The truth of the statement in our opinion for which Judge Ruiz finds no support in the record is, in our view, obvious. Our recognition of the obvious does not constitute "appellate fact-finding." [26]

## IV.

For the foregoing reasons, the motions judge correctly denied Womack's motion to suppress evidence. Womack's convictions must be and each is hereby

*Affirmed.*[27]

RUIZ, Associate Judge, dissenting:

By definition, every encounter between a police officer and a citizen suspected of a violent offense is accompanied by a hypothetical threat to the officer's safety. That hypothetical threat, however, does not overcome the constitutional prohibition against unreasonable searches and seizures. A seizure pursuant to a warrant, requiring probable

---

26. Our dissenting colleague also criticizes as "without support in or reference to the testimony" our observation that the officers could not "foresee what a man suspected of armed rape and kidnapping might try to do to avoid apprehension." Dissenting op. at 628. We are at a loss to understand on what basis the officers could be expected to assume that Womack would respond peacefully to their arrival, or how they could anticipate what his reaction to possible apprehension would be. The most significant fact which the officers knew at the time of their seizure of Womack was that if he was the right man, then he had apparently committed rape,

kidnapping and robbery a few hours earlier, and that he had used a handgun to force his victims to submit. Such a man was surely dangerous, and any failure by the officers to take immediate steps to protect themselves in such a situation would surely have been foolhardy to say the least.

27. In light of our disposition, we do not reach the government's alternative contentions that the evidence sought to be suppressed was not the fruit of the allegedly unlawful seizure and that, in any event, the officers had probable cause to arrest Womack.

cause, is presumptively reasonable. All other seizures are presumed unreasonable. Thus, the government bears the burden of proving that the officer's actions were necessary in the light of facts that, in their totality, reasonably led the officer to believe that the suspect was actively engaged in criminal activity, posed a danger to the officer's safety, or was likely to flee. Without such articulated justification, handcuffing a suspect is improper within the limited scope of an investigatory detention and amounts to an illegal arrest. Because such justification is lacking in this case, I conclude that the police unconstitutionally arrested David Womack when they handcuffed him in his home before they had probable cause. This means that any evidence seized that was the fruit of the illegality must be suppressed. Instead of reversing, however, I would remand this case to the trial court for a determination whether the evidence that was taken after the unlawful seizure was the fruit of the illegal arrest.

In reaching my conclusion that the seizure was unlawful, I rely on several propositions which are well borne-out by established case law in the Supreme Court and in this jurisdiction. The first is that the reasons grounding the exception to the constitutional probable cause requirement established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), do not easily extend to seizures in one's home. The second proposition is that a seizure without a warrant or probable cause,

whose scope is not reasonably supported by specific concerns articulated by the police, will be considered a *de facto* arrest, and its fruit must be suppressed. The third proposition is that where there is no warrant or probable cause to arrest, the government bears the burden of showing which facts police officers relied on in reaching their conclusion that a particular investigative detention procedure was the least intrusive means reasonable under the circumstances. I add a fourth proposition, which I believe is violated in the majority's opinion, that where the government fails to provide any such facts, a reviewing court may not introduce facts and inferences that were never presented or argued in the trial court in order to justify the reasonableness of the seizure.

The majority chastises me for introducing a new legal principle—based on the argument that *Terry* does not justify Womack's seizure in his home—not relied upon by the parties in the trial court nor argued on appeal. Not so: my analysis tracks Womack's argument to the trial court in the motion to suppress and to us on appeal.[1] Like the majority, I have cited cases that the parties did not alert us to, and have included some historical support to provide a clearer perspective on what is, after all, bedrock constitutional law. I assume that it is our job as appellate judges to write as fully reasoned opinions as we are able for the benefit of trial courts and litigants.[2] Unfortunately, the ma-

---

1. Womack's brief on appeal states the issue presented as follows:

   Whether the police exceeded the allowable scope of *Terry*, resulting in an unlawful arrest, by removing appellant from his home in handcuffs, without a reasonable necessity, requiring suppression of an out-of-court identification, physical evidence and statements as the fruits of that unlawful arrest.

   Distinguishing the instant case from cases applying *Terry* to justify detentions involving handcuffs, Womack's brief concluded:

   Womack was a lone suspect, and there were three officers inside his home. He made no furtive gestures, and neither attempted to flee nor disobeyed police commands. He was inside his home, wearing only the shorts and shirt described as sleeping attire, which precluded any ability to hide a weapon on his person. Given the absence of any aggravating elements, the handcuffing was not justified by any facts creating a reasonable necessity to

escalate the intrusiveness of the seizure. The conduct thus exceeded the scope of what was reasonable under *Terry*.

2. I do not perceive any inefficiency or unfairness here in the sense that either the trial court or the litigants could rightly claim to have been blindsided by my analysis. *Cf. Carducci v. Regan*, 230 U.S.App.D.C. 80, 86, 714 F.2d 171, 177 (1983) ("Of course not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel through our own deliberation and research. But where counsel has made no attempt to address the issue, we will not remedy the defect, especially where, as here, 'important questions of far-reaching significance' are involved.") (internal citation omitted). In this case, counsel clearly addressed the issue and argued, as I do, that the facts presented did not justify the handcuffing. *See Mills v. Cooter*, 647 A.2d 1118, 1123 n. 12 (D.C. 1994) (noting that parties are not limited to the

jority spends more time castigating me for making my argument than with the merits of my analysis.

In any event, I cannot take credit for creating any "new principle" here. My point of departure is neither new nor different from the majority's: the only possible justification for the detention in this case must be found in the *Terry* exception to the Fourth Amendment's probable cause requirement. Where we disagree is that I believe that the Supreme Court's reasoning in *Terry,* when viewed in the context of the Court's well-established Fourth Amendment jurisprudence, is being stretched beyond recognition to justify the handcuffing in this case.

Judge Schweïb calls my analysis the "diminished *Terry* exception." I do not believe that the label fairly captures my objection to the majority's opinion. My point is not, as Judge Schwelb asserts, that the *Terry* exception is "diminished" when police make intrusive contacts in the home. The *Terry* exception exists and it is not up to this court, whether the matter is raised or not, to "diminish" it. The question is whether the principles underlying the *Terry* exception apply to the in-home seizure in this case and whether the record shows that the government met its burden under *Terry.* I believe that it is the majority's holding that "diminishes" the *Terry* exception by ignoring the reasons that underlie it.

## I.

Because any exception to the probable cause requirement must be supported by adequate facts, I first set out the facts of this case, paying particular attention to the facts presented by the police at the suppression hearing to justify the officers' actions. In the early morning hours of November 30, 1992, detectives of the Metropolitan Police Department knocked on the door at 324 Taylor Street, N.W., which was the home of the appellant, Womack, and his grandmother, Sylvia Steele. At the time of the knock, the detectives knew that N.H. had been raped, and that she and her mother had been kidnapped and robbed at gunpoint by a masked individual N.H. claimed to recognize as "D." The police were led to the address on Taylor Street after a friend of N.H.'s gave the police two telephone numbers she said belonged to "D," and one of the telephone numbers turned out to correspond to the Taylor Street address. The police had no other information regarding the identity of the perpetrator.[3]

Steele responded to the knock on the door, and the detectives asked whether she had a son named "D." Steele responded that she did not, but stated that she had a grandson named David. Steele admitted the police to her home and at their direction, called Womack to come downstairs. Before Womack appeared, one detective attempted to ascend the stairs to retrieve Womack himself. Steele told the detective that he did not need to go up, and called Womack again. Womack then appeared in his sleeping attire, consisting of shorts and a t-shirt, with bare feet. Although N.H. had reported that a scar near the perpetrator's eye had helped her identify him as "D," the police did not testify that when they saw Womack, they noted any similar scar. Womack made no apparent attempt to resist or flee. The motions court concluded that at this moment, when the police encountered Womack in his home, they lacked probable cause to arrest him.

The police did not testify at the hearing that they ever thought Womack might be armed. They testified that they did not frisk him. Instead, the police immediately handcuffed Womack, and told him to step out onto the porch. At this time, Womack was in the custody of at least three but "fewer than ten" police officers.[4] After Womack stepped outside, at least onto the porch and

precise arguments they made below") (citing *Yee v. City of Escondido, Cal.*) 503 U.S. 519, 529, 112 S.Ct. 1522, 1529, 118 L.Ed.2d 153 (1992)).

**3.** There was evidence that N.H. provided the police with a photograph of an individual whom trial evidence later revealed to be the appellant Womack. There was no testimony, however, that the police officers who would later detain

Womack at his home had the photograph, relied on the photograph in identifying Womack as a suspect, or thought that Womack resembled the individual in the photograph.

**4.** Testimony among the police detectives appeared to vary on this question, and the motions court made no findings regarding the number of officers present.

possibly down to the street into the headlights of a squad car occupied by N.H.,[5] N.H. identified Womack as her assailant. Either immediately before or immediately after this identification, but in any event after he was handcuffed, there is evidence that Womack "scuffled" in a brief attempt to resist the identification procedure.[6] After N.H. identified Womack, the detectives announced that Womack would be accompanying them to the station. Shortly thereafter, Steele retrieved boots for Womack to wear, which, when produced, were seized by the officers on the ground that they matched a description N.H. had given of the boots worn by her assailant. Womack was then taken to the Metropolitan Police Department Sex Offense Office, where he made several remarks to the booking officer that would later be used against him at trial.

## II.

The core of Fourth Amendment protection is the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment requires that a search or seizure be conducted in compliance with the Constitution's warrant clause. *Arkansas v. Sanders*, 442 U.S. 753, 758, 99 S.Ct. 2586, 2589–90, 61 L.Ed.2d 235 (1979). The purpose of the warrant requirement is to interpose an independent assessment of probable cause between a citizen and an "officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). To underscore the requirement of a warrant issued upon probable cause, a warrantless search or seizure in any context is presumed unlawful. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Thus, if a warrantless search or seizure produced evidence that the government seeks to introduce at trial, the burden is on the government to overcome the presumption of illegality by justifying the search based on facts that could bring it within certain recognized, limited exceptions to the warrant requirement. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983); *Roy v. United States*, 527 A.2d 742, 743 (D.C.1987).

### A. *Departure from the Warrant Requirement*

The motions court in this case found that the officers handcuffing Womack had neither

---

**5.** The different police officers involved in this identification procedure testified differently as to how far out of the house the police took Womack. The trial court made no specific findings in this respect except to say that the police took Womack "outside."

**6.** The trial court made no findings regarding Womack's "scuffle." Detective Tyson Coble's testimony on this point varies on direct examination and on cross. The direct examination on this point was as follows:

Prosecutor: And when he came downstairs was he dressed?
Detective Coble: No, he was not fully dressed. He was in his sleeping attire.
Prosecutor: And tell the Court what happened after you saw him in his sleeping attire?
Detective Coble: I told him that I needed him to step outside for a minute and talk to me. *He attempted to resist but then he did step outside on the porch.*
Prosecutor: And what happened on the porch?
Detective Coble: Once he stepped out on the porch, he was viewed by [N.H.].
Prosecutor: He was in handcuffs at that time, was he not?
Detective Coble: Yes.
On cross-examination, the detective testified:

Detective Coble: He had on like shorts.
Defense Counsel: Did you take him outside for the show-up with those shorts?
Detective Coble: Right outside the door, yes.
Defense Counsel: And you indicated on your direct testimony that you told him initially that you wanted to talk to him about something; is that right?
Detective Coble: Right.
Defense Counsel: And, you wanted to talk to him about getting into a show-up or being involved in a show-up identification.
Detective Coble: No, I didn't want to talk to him—I just wanted to talk to him.
Defense Counsel: But what you did was not talk to him. You took him outside for the show-up; right?
Detective Coble: He refused to talk. *He started to scuffle, and I took him back inside.*
Defense Counsel: And when you took him outside, he was already handcuffed; is that correct?
Detective Coble: That's correct.
Defense Counsel: And he was in your custody at that point; is that right?
Detective Coble: Yes.
Defense Counsel: Certainly because of the handcuff, he was not free to go.
Detective Coble: That's right.
(Emphasis added.)

a warrant nor probable cause to believe Womack had committed an offense at the time that they handcuffed him. Therefore, the motions court was required to find, and we are required to agree, that the police's seizure of Womack met a recognized exception to the requirement of a warrant.

There are "a few jealously and carefully drawn exceptions" to the warrant requirement that the government may rely on in justifying a warrantless seizure. *Sanders, supra,* 442 U.S. at 759–60, 99 S.Ct. at 2590–91 (citing *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958)). One commonly-recognized exception to the warrant requirement is a felony arrest in a public place on probable cause. The Constitution itself suggests, and the Supreme Court has repeatedly recognized, that such an arrest is permissible. U.S. CONST. amend. IV (noting that a person may not be seized, "and no Warrants shall issue, but upon probable cause"); *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (holding that an officer could arrest a suspect in a public place based upon probable cause even without exigent circumstances); *see Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (demonstrating that police may arrest a suspect based upon probable cause, while an arrest based only on reasonable suspicion is illegal).

The Supreme Court has not been similarly tolerant of seizures of suspects occurring in the suspect's home. *See, e.g., Coolidge v. New Hampshire,* 403 U.S. 443, 477–78, 91 S.Ct. 2022, 2044, 29 L.Ed.2d 564 (1971) (reaffirming that "searches and seizures in a man's house without warrant are *per se* unreasonable"); *United States v. Harris,* 629 A.2d 481, 486 (D.C.1993). This approach has historical roots; "the overriding respect for the sanctity of the home ... has been embedded in our tradition since the origins of the Republic." *Payton v. New York,* 445 U.S. 573, 601, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). This frequently-noted special constitutional protection confirms that in no setting is the protected "zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Id.* at 589, 100 S.Ct. at 1381–82.[7]

The Supreme Court has thus recognized that unlike an arrest in a public place, a warrantless entry into a home to effect the arrest of a suspect—even one whom the police have probable cause to believe committed a felony—is presumptively illegal.[8] *See New York v. Harris,* 495 U.S. 14, 17, 110 S.Ct. 1640, 1642–43, 109 L.Ed.2d 13 (1990). The only recognized exceptions to this rule are those based on exigent circumstances, including to render emergency aid if an officer reasonably believes such aid is necessary. *See Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. Booth,* 455 A.2d 1351 (D.C.1983). Notably, because the cases announcing these

**7.** This "respect for the sanctity of the home" is reflected in the Court's opinion in *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). There, the Court quoted, at length, a speech by William Pitt to underscore the "precious interest" of an individual in his own home to be free of warrantless searches:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement.

*Id.* at 307, 78 S.Ct. at 1195.

**8.** This rule is closely followed. In *Payton,* the Court struck down a New York law which allowed police, absent exigent circumstances, to enter a home and arrest a suspect without a warrant when the officers had probable cause to believe that the suspect had been involved in a crime. 445 U.S. at 587–88, 100 S.Ct. at 1380–

81. In distinguishing the permissible public arrest in *Watson, supra,* the Court stated in *Payton* that "[t]o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home." *Payton, supra,* 445 U.S. at 588–89, 100 S.Ct. at 1381–82 (quoting *United States v. Reed,* 572 F.2d 412, 423 (2d Cir.1978)). The Court stated that "[a]t the core of the Fourth Amendment ... is the fundamental concept that any governmental intrusion into an individual's home ... must be strictly circumscribed." *Id.* at 582 n. 17, 100 S.Ct. at 1377–78 (citations omitted); *see Hilliard v. United States,* 638 A.2d 698, 706 (D.C.1994) (requiring both probable cause and exigent circumstances to justify a warrantless and non-consensual entry into suspect's home to effect an arrest); *Derrington v. United States,* 488 A.2d 1314, 1322–23 (D.C.1985) (same), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988).

principles are based on the special protection from police intrusion afforded an individual at home, they do not address the implications of a valid consent to the entry of the police. *Robertson v. United States,* 429 A.2d 192, 193–94 (D.C.1981) (distinguishing *Payton, supra,* 445 U.S. 573, 100 S.Ct. 1371, and *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) on the ground that both cases involved nonconsensual entry into the home).

This case presents not an absence of valid consent to enter the home, but an absence of probable cause· to seize Womack when he came down the stairs of his home to meet the officers. *See Robertson, supra,* 429 A.2d at 194 (holding that consensual entry into the home to effect a warrantless arrest is constitutional where there is probable cause). The majority seeks its support for Womack's seizure mainly in cases relying on *Terry.* A *Terry* "stop and frisk" constitutes one of the most-recognized exceptions to the probable cause requirement when a seizure is effected in a public place. *Terry, supra,* 392 U.S. at 20, 88 S.Ct. at 1879. At the outset, I question whether a *Terry* analysis is properly applied here, because there is no indication that the concerns which led the Supreme Court to validate the "stop and frisk" police investigative procedure used in *Terry* and its progeny apply to the kind of police-initiated actions that led to the search and seizure of Womack in his home in this case. That hesitation is not essential to my conclusion that Womack was unconstitutionally seized, however, because even applying *Terry* analysis, the government has failed to meet its burden of justifying its seizure of Womack, as discussed in Section C below.

### 1. *Terry* Stops

The facts of the *Terry* case are both significant and generally known.[9] The Court held in *Terry* that a brief investigative stop is less intrusive than a traditional arrest, and that therefore, an officer needs proportionally less justification to effect such a stop. *Id.* at 26, 88 S.Ct. at 1882–83. The Court thus interpreted the "reasonableness" requirement of the Fourth Amendment to permit brief, on-the-street, relatively unintrusive investigatory detentions based upon officers' observations of ongoing or prospective crime. The Court did not in *Terry,* and has not to date, substituted mere reasonableness for the constitutional probable cause requirement for an arrest. *See Michigan v. Summers,* 452 U.S. 692, 697, 101 S.Ct. 2587, 2591, 69 L.Ed.2d 340 (1981) ("Indeed, any 'exception' that could cover a seizure as intrusive as [one that 'was in important respects indistinguishable from a traditional arrest'] would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause.") (quoting *Dunaway v. New York,* 442 U.S. 200, 213, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979)); *see also Dunaway, supra,* 442 U.S. at 214, 99 S.Ct. at 2257 ("For all but those narrowly defined intrusions, the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause.").

In this case, because the officers could not validly place Womack under arrest when they encountered him in his home, the government needs to rely on the following legal inference: that officers who have consent to be on the premises of a private home, like officers who encounter a suspect outside, can effect a seizure by meeting some exception to the probable cause requirement. In other words, the government impliedly argues in this case that police officers with consent to be on private premises have the same right to restrain the liberty of a suspect they en-

---

**9.** In *Terry,* an officer observed three individuals engaged in conduct which, in light of his thirty years of experience, appeared to be preparation for a robbery. *Id.* at 6, 88 S.Ct. at 1872. After observing outwardly suspicious conduct for several minutes, the officer identified himself and stopped the men. *Id.* at 7, 88 S.Ct. at 1872. When the suspects failed to answer his questions, the officer grabbed one individual and patted-down his outer clothing in search of a gun or other weapon. *Id.* The pat-down in fact yielded a handgun, which the officer removed from the individual. *Id.* The officer then searched the other two individuals and discovered one other gun. *Id.* Before trial, the defendants sought to suppress production of the gun as the fruit of an illegal arrest. *Id.* at 7–8, 88 S.Ct. at 1872–73. The defendants in that case claimed that the officer, in grabbing the first individual and frisking him, had seized the individual with neither a warrant nor probable cause. *Id.*

counter there as they would if that suspect were in a public place. This court has never resolved the question framed in this way, and it may or may not be a legally correct position.[10] Nevertheless, in order for the government to rely on this legal assumption, as it does, it must be agreed that the facts presented to the trial court meet stringent factual criteria outweighing the presumption that a person in his home enjoys heightened constitutional protection. The government must use the least intrusive means reasonable in light of the facts before the officers.

> As the Court explained in *Royer, supra:*
> The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.[11] Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

460 U.S. at 500, 103 S.Ct. at 1325–26 (internal citations omitted). In subsequent cases the Supreme Court has not, as the majority suggests, *ante* at ——, rejected the requirement that the police employ the least intrusive means in the context of an investigatory detention.[12] *Compare Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325–26 *with* the earlier case, relied upon by the majority, of

*United States v. Martinez–Fuerte,* 428 U.S. 543, 556–57 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976) (rejecting, in the context of compulsory stops at border checkpoints designed to stem illegal immigration, a defendant's claim that other means, such as prohibiting employers from hiring illegal immigrants, would also accomplish the same legislative goal without implicating the Fourth Amendment). Rather, the Court has further explained that the Fourth Amendment's yardstick of reasonableness also should be employed in evaluating whether the police used the least intrusive means as perceived by them. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *United States v. Sharpe,* 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985).

Courts that justify compulsory detentions in public places by analogy to *Terry, see, e.g., Royer, supra,* 460 U.S. at 510, 103 S.Ct. at 1330–31 (Brennan, J., concurring) (describing investigatory detention as a "*Terry*-type 'investigative stop'"); *United States v. Alston,* 832 F.Supp. 1, 3 (D.D.C.1993) (characterizing police stop of car "*Terry*-like"), follow the rationale of *Terry,* which explicitly relies upon the inherent exigencies of "on-the-street" encounters. *Terry, supra,* 392 U.S. at 12, 88 S.Ct. at 1875 (stating that "we approach the issues in this case mindful of the limitations of the judicial function in controlling the myriad daily situations in which policemen and citizens confront each other *on the street*" and that "[n]o judicial opinion can comprehend the protean variety of the

**10.** I think that it is a doubtful proposition. We have stated that "Fourth Amendment law presumes that warrantless searches and seizures inside a home are unreasonable absent exigent circumstances." *Oliver v. United States,* 656 A.2d 1159, 1164 (D.C.1995) (defining "exigent circumstances" as a "hot pursuit" situation, likely destruction of evidence, or protection of persons inside residence). However, despite the majority's criticism of my dissent, I do not believe that this narrow question has been briefed, or needs to be resolved in this case, because the government has not, in any event, met the requirements of *Terry.*

**11.** Womack has not challenged the duration of the seizure in this case. I agree with the majority that it appears to have been relatively short. What is at issue is the reasonableness of the handcuffing in light of the circumstances confronting the police.

**12.** I note also that the cases cited by the majority in support of abandoning a requirement for "least intrusive means" involved on-the-street or public place encounters where the police suspect ongoing crime. In those situations there is both a lessened interest in privacy and, because they occur in open spaces involving fast-moving situations outside of the control of the police, a greater need for vigilance in the police's action.

*street encounter*") (emphasis added); *Bridges v. United States,* 392 A.2d 1053, 1055–56 (D.C.1978) (noting that *Terry* validated limited detention for " 'on-the-scene' investigation"); *see also Dunaway, supra,* 442 U.S. at 210, 99 S.Ct. at 2255 (stating that *"Terry* ... involved a limited on-the-street frisk for weapons"); *Harris v. United States,* 382 A.2d 1016, 1018–19 (D.C.1978) (discussing the nature of "street encounters"); *Cooper v. United States,* 368 A.2d 554, 556–57 (D.C.1977) (observing *Terry*'s change in the law relating to "street encounters" and "street detentions"). Courts regularly recognize that the function of the police would be undermined, and our confidence in their protection compromised, if officers were not able to conduct adequate investigation where criminal activity is actively indicated. *See, e.g., Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1922–23, 32 L.Ed.2d 612 (1972) (stating that conducting a *Terry* stop "may be the essence of good police work"); *In re M.M.,* 407 A.2d 698, 700 (D.C.1979) ("[W]e are not persuaded that this officer should have simply shrugged his shoulders and allowed appellees to proceed on their way."); *Davis v. United States,* 284 A.2d 459, 460 (D.C.1971); *see also King v. United States,* 550 A.2d 348, 357 (D.C.1988); *Harris v. United States, supra,* 382 A.2d at 1019; *Cooper, supra,* 368 A.2d at 557. The danger to the police, and society's interest in the diligent investigation of a suspected crime, provide the foundation for permitting officers to stop individuals to investigate suspected offenses where the officers, for any number of reasons, might not get a second chance. *Adams v. Williams, supra,* 407 U.S. at 145–46, 92 S.Ct. at 1922–23; *Offutt v. United States,* 534 A.2d 936, 938 n. 2 (D.C.1987) (citing *Lawson v. United States,* 360 A.2d 38 (D.C.1976) (seeking to avoid lost opportunities for investigation), additional citations omitted); *see also Sharpe, supra,* 470 U.S. at 682–88, 105 S.Ct. at 1573–77; *United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 678–79, 83 L.Ed.2d 604 (1985) (observing that police may constitutionally apprehend moving vehicles if the officers possess a reasonable suspicion of criminal activity).

Cases upholding *Terry*-like seizures invariably rely on the possibility that the suspect might flee in concluding that police conduct in restraining the suspect was reasonable. *See, e.g., United States v. Place,* 462 U.S. 696, 704, 103 S.Ct. 2637, 2643, 77 L.Ed.2d 110 (1983) (noting the need for *Terry* seizures of suspected drug couriers "[b]ecause of the inherently transient nature" of the activity at airports; affirming reversal of conviction on ground that seizure was unreasonably broad); *Adams v. Williams, supra,* 407 U.S. at 145–46, 92 S.Ct. at 1922–23; *Brown v. United States,* 546 A.2d 390, 392–393 (D.C. 1988) (noting that the stopped suspects were attempting to drive off at an excessive speed, consistent with "actions typically taken by individuals seeking to secrete themselves while leaving a crime scene"); *United States v. Bennett,* 514 A.2d 414, 414 (D.C.1986) (noting that suspects "bolted" when police arrived); *Tobias v. United States,* 375 A.2d 491, 492 (D.C.1977) (noting that suspect ran after police officer identified himself); *Hinton v. United States,* 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969) (noting that suspect "bolted" after a police search of his companion revealed contraband); *see also Powell v. United States,* 649 A.2d 1082, 1085 (D.C.1994) (per curiam) (opinion of Sullivan, J.) (reversing conviction where evidence of attempted flight inadequate to help justify *Terry* stop).

One point to bear in mind in assessing whether *Terry* fairly justifies Womack's seizure is that this case does not present a true *Terry* stop. The officers in the instant case were investigating a completed crime, rather than observing ongoing criminal activity or trying to prevent a crime still in the planning stage. *See In re T.T.C.,* 583 A.2d 986, 989 (D.C.1990) ("The Terry exception to the probable cause requirement is limited to circumstances 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.' ") (quoting *Terry, supra,* 392 U.S. at 30, 88 S.Ct. at 1884) (emphasis omitted). Although the Supreme Court has noted that police may detain a *fleeing* suspect in a *Terry*-like stop when the individual is suspected of a completed crime, in so holding, the Court suggested that the burden on the government to

justify the detention would likely increase in the absence of the *Terry* interest in thwarting ongoing crime. *Hensley, supra,* 469 U.S. at 228–29, 105 S.Ct. at 680–81; *see also New York v. Spencer,* 84 N.Y.2d 749, 622 N.Y.S.2d 483, 646 N.E.2d 785 (1995). The Supreme Court has also suggested that where officers are investigating a past crime, detention for the purpose of obtaining evidence that is not likely to be destroyed in time—such as fingerprint samples (or, by obvious analogy, an identification by the complainant)—is rarely justifiable. *Davis v. Mississippi,* 394 U.S. 721, 727, 89 S.Ct. 1394, 1397–98, 22 L.Ed.2d 676 (1969); *see also Hensley, supra,* 469 U.S. at 229, 105 S.Ct. at 680–81 (specifically declining to decide undecided question "whether *Terry* stops to investigate all past crimes, however serious, are permitted").

The Fourth Amendment balances the level of intrusion in a police encounter against the "importance of the governmental interests alleged to justify the intrusion." *Hensley, supra,* 469 U.S. at 228, 105 S.Ct. at 680; *Harris v. United States, supra,* 382 A.2d at 1018. Thus, if the governmental interest is less exigent when officers are investigating a completed crime, then the permissible intrusion during a *Terry*-like stop for a completed crime is more limited than that for an ongoing crime. *Hensley, supra,* 469 U.S. at 228, 105 S.Ct. at 680; *see also Spencer, supra,* 622 N.Y.S.2d at 486–87, 646 N.E.2d at 788–89; *State v. Hubbard,* 861 P.2d 1053, 1054–55 (Utah App.1993) (concluding that investiga-

tion of a completed crime did not present the exigencies inherent in investigating ongoing or prospective crime; without additional articulated exigencies, stop of defendant's car was illegal).

It would thus appear that the reasonable scope of a *Terry*-like investigatory detention—in its level of intrusion—must be more narrow when facts and exigencies similar to those in the *Terry* case are not present. Although the confluence of such exigencies in the home is not impossible to imagine, their presence in the home is surely the rare exception and not the rule.[13] *Hayes v. Florida,* 470 U.S. 811, 817 n. 3, 105 S.Ct. 1643, 1647 n. 3, 84 L.Ed.2d 705 (1985) (noting the absence of asserted exigent circumstances necessitating warrantless removal of suspect from his home in reversing conviction on Fourth Amendment grounds). In fact, in the few cases in which a suspect was detained in his home or in a private place for investigation, the location of the seizure has been evidence that the officers *exceeded the scope of a* Terry *stop.*[14]

Heretofore, this court had never identified the reasonable scope of an investigatory detention which takes place in a suspect's home. The government did not cite any case, from any jurisdiction, upholding under *Terry* an investigatory detention which took place within a suspect's home. Indeed, when asked at oral argument, the government indicated that it did not know of a case on

---

**13.** Although the Supreme Court has recognized that "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter," *Maryland v. Buie,* 494 U.S. 325, 333, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990), this observation was made in the context of a protective search during an arrest accompanied by probable cause. The reasonable scope of police activity based upon probable cause is far broader than police action based upon reasonable suspicion. In this case, because there was no probable cause, the government has the burden of showing the facts that justified a *Terry*-type seizure in Womack's home.

**14.** In *Dunaway, supra,* police removed an individual from a neighbor's home to question him at a police station. The Supreme Court relied upon the fact that the investigatory detention occurred

in a private home in ruling that the officers had exceeded the scope of a *Terry* stop. 210 U.S. at 212, 28 S.Ct. at 636. Similarly, in *Hayes v. Florida,* 470 U.S. 811, 814–18, 105 S.Ct. 1643, 1645–48, 84 L.Ed.2d 705 (1985), officers singled out an individual as the principal suspect before confronting the individual on the porch of his home. The officers then removed the individual from that home and transported him to the police station for questioning and fingerprinting. *Id.* The Court relied upon the removal of the suspect from his home during the investigatory detention in finding that the officers had effected an illegal arrest. *Id.*

In *Keeter v. United States,* 635 A.2d 903 (D.C. 1993), this court reversed a conviction on Fourth Amendment grounds where suspect was removed from his bed and taken to the police station for questioning on reasonable suspicion alone.

point.[15] The majority's independent research uncovered two cases, cited *ante* at note 20, in which the government sought to justify a detention in a private home under *Terry*.[16] These cases do not support the majority's conclusion in this case. In *Hill v. United States,* 664 A.2d 347, 354 (D.C.1995), we appear to have assumed the very proposition I claim is correct: that what may constitute a proper *Terry* detention out on the street may well be illegal if it occurs in the home. *Hill* held that where an individual is the object of reasonable suspicion, and is found at the home of another party where the suspect had no privacy interest, "the legality of any detention or search of the appellant's person would 'be judged within the context of a confrontation between citizen and law enforcement authority in a public place,'" i.e., by the *Terry* standard, *because it did not take place in his home. Id.* (citing *United States v. McNeal,* 955 F.2d 1067, 1074–76 (6th Cir.), *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3039, 120 L.Ed.2d 908 (1992)). The court clearly implied in its holding that if the suspect had had a privacy interest in the premises, the detention could *not* properly be judged under *Terry* standards. *See also McNeal, supra,* 955 F.2d at 1077 (upholding as the equivalent of a *Terry* stop in a public place a "limited protective search for concealed weapons" on a suspect in an apartment in which the suspect had no expectation of privacy or possessory interest, explicitly because the officers testified to facts tending to show that the suspect was "armed and presently dangerous") (quotations omitted).

The majority also cites *United States v. Brooks,* 2 F.3d 838, 841–42 (8th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1117, 127 L.Ed.2d 427 (1994), which upheld a limited "patdown" in a suspect's home after the police, who (like the officers in this case) were on the premises by consent, had developed reason to believe that the person with whom they were dealing had committed an armed robbery and, from a "noticeable bulge" in his pocket which was later described as bearing "the outline of a gun," continued to be armed. *Id.* at 841. Although the Eighth Circuit in *Brooks* does appear to have applied *Terry* standards to an in-home search, it strictly scrutinized the police's conduct in light of the police's articulated justification—applying the very fact-based scrutiny I believe is lacking here. The factual differences between the situation in *Brooks* and the situation before us are striking and, in my view, determinative in terms of the legality of the police's actions. First, *Brooks* involved a patdown; not the use of handcuffs. As discussed *infra,* the level of intrusiveness involved in handcuffing is so associated with arrests that it requires particular justification in a temporary detention. *See Hood v. United States,* 661 A.2d 1081, 1084–85 (D.C.1995) (noting that a *Terry* search can only be as broad as the specific exigencies that justify it). Second, even though the crime that had been committed was, as here, a violent one, the court in *Brooks* deemed it critical that the officers had "reasonable, particularized suspicion that the suspect [was still] armed." *Id.* at 842. This suspicion was supported by the officers' testimony regarding the bulge in the suspect's pocket. In the instant case, there was no particularized suspicion articulated by the officers that Womack was armed when he got out from his bed and came down the stairs to meet them, as evidenced in part by the fact that they did not frisk him. *See Hood, supra,* 661 A.2d at 1084 (requiring that police provide "objective justification for concluding

---

**15.** Attempting to address the lack of case law support for the government's brief for *Terry* detentions in the home, the majority notes that Womack relied on *Prophet v. United States,* 602 A.2d 1087 (D.C.1992), which involved, according to the majority, *"Terry*-type issues" regarding seizures in an apartment. *Ante* at 612 & note 19. That is not so. In *Prophet* we held that there was probable cause to support an arrest in an apartment. This court did not justify the handcuffing of the suspects in *Prophet* as a reasonable incident to a *Terry* stop. In any event, Womack correctly cites *Prophet* for a different proposition,

° which is that a seizure involving handcuffing under circumstances similar to those in this case was considered by this court to be an arrest requiring probable cause.

**16.** Footnote 20 of the majority opinion also cites *Michigan v. Summers, supra,* 452 U.S. at 700–01, 101 S.Ct. at 2593–94, discussed *infra,* which stands for the different proposition that officers executing a valid search warrant may detain the occupants of the premises while the search is being conducted.

that [the suspect] might be armed and dangerous *at the time* ") (emphasis added).

One compelling consideration in regard to when *Terry* can justify in-home seizures is that the *Terry* Court—and almost all courts following the *Terry* rationale in upholding police conduct—clearly intended that a *Terry* stop be in fact a *stop*, a characterization that could not fairly describe the actions of police encountering a person in his home who, until the arrival of the police, had apparently been asleep in his bed. *See Keeter v. United States*, 635 A.2d 903, 904 (D.C.1993). For example, cases that justify compulsory placement in a complainant's view for a show-up identification procedure have always concerned stops of suspects on the street. *See, e.g., In re M.E.B.*, 638 A.2d 1123 (D.C.1994); *King, supra*, 550 A.2d at 357; *In re M.M., supra*, 407 A.2d 698. In short, the Fourth Amendment balancing of governmental and privacy interests struck in *Terry* requires that the scope of the detention in this case be narrow because it took place in Womack's home for the purpose of investigating a completed crime.

### 2. Handcuffs

Universally, courts have recognized that the use of handcuffs substantially increases the intrusiveness of a *Terry* stop and must be independently justified. *See United States v. Melendez–Garcia*, 28 F.3d 1046, 1052 (10th Cir.1994) ("[T]he use of ... handcuffs ... is a far greater level of intrusion."); *United States v. Del Vizo*, 918 F.2d 821, 824–25 (9th Cir.1990) (finding that armed officers, by ordering suspect to the ground and handcuffing him, exceeded the scope of *Terry* stop and arrested defendant where defendant was compliant and only suspected of drug-trafficking); *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1295–96 (9th Cir.1988) (holding that the use of handcuffs was not justified under the circumstances); *cf. Crawford v. United States*, 369 A.2d 595, 599 (D.C.1977) (reaffirming that "detention must be properly limited"); *Oliveira v. Mayer*, 23 F.3d 642, 645–46 (2nd Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995) (in a § 1983 action for unlawful arrest, handcuffing of suspect amounted to arrest because degree of force

was unwarranted due to nature of underlying crime and number of officers present on the scene).

Fourth Amendment jurisprudence, and common sense, do not view the use of handcuffs as an intrusion *de minimis*. *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983) ("handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop"). This court has never allowed handcuffing as a routine incident to a *Terry* stop. To be manacled, especially in one's home and in front of one's family, is a humiliating experience, and surely one that carries the stigma of guilt. *See Washington v. Wheeler*, 108 Wash.2d 230, 737 P.2d 1005, 1019 (1987). Thus, although the use of handcuffs is not legally restricted only to arrests, this court has carefully scrutinized the government's proffered justification when the police use handcuffs during an investigative detention. *See, e.g., In re M.E.B., supra*, 638 A.2d at 1127–28 (finding that facts supported the officers' fear of suspects necessitating use of handcuffs); *Allison v. United States*, 623 A.2d 590 (D.C.1993) (sustaining use of handcuffs without probable cause where the government established that the suspect attempted to escape); *Prophet v. United States*, 602 A.2d 1087, 1089–90 (D.C.1992) (assuming, without holding, that "handcuffing turned an otherwise valid *Terry* stop into an arrest," but concluding that the arrest was supported by probable cause). Thus, where handcuffs have been used, and the government seeks to distinguish an investigatory detention from an arrest, a heavy burden of justification for that use lies properly with the government. *See Royer, supra*, 460 U.S. at 500, 103 S.Ct. at 1325–26 (requiring that the government demonstrate that it used the least intrusive means in effecting an investigative detention).

### B. The *De Facto* Arrest

Even a search or seizure carried out pursuant to a proper exception to the warrant requirement is illegal when the search or seizure exceeds the reasonable intrusion necessary under the circumstances. *Dunaway,*

*supra,* 442 U.S. at 216, 99 S.Ct. at 2258–59. A detention that exceeds a reasonable scope will result in the seizure being deemed an arrest. *Hayes v. Florida, supra,* 470 U.S. at 816, 105 S.Ct. at 1647 (adhering to the view that certain investigative seizures "are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause"); *Keeter, supra,* 635 A.2d at 904 (holding that evidence must be suppressed because it resulted from a "seizure [that] amounted to an arrest"); *see United States v. Gayden,* 492 A.2d 868, 872–74 (D.C.1985); *see also Offutt, supra,* 534 A.2d at 938 (citing *Davis v. United States,* 498 A.2d 242, 245 (D.C.1985); *United States v. White,* 208 U.S.App.D.C. 289, 294–95, 648 F.2d 29, 34–35, *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981)); *Thompkins v. United States,* 251 A.2d 636, 638–39 (D.C.1969).

Notwithstanding that Womack's seizure bore all the objective indicia of an arrest, the majority relies on the fact that the police would have let Womack go if the identification procedure had not borne fruit—in other words, that the police were effecting "a temporary detention, designed to last only until a preliminary investigation either generate[d] probable cause or result[ed] in the release of the suspect." *In re M.E.B., supra,* 638 A.2d at 1126, *quoted ante* at 610. One problem with the logic of this approach to justifying initial seizures—that the police would have released Womack if probable cause did not develop—is that it justifies police procedure based on its result. It is a logic that has been explicitly held by the Supreme Court to be incompatible with the Fourth Amendment. *See United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 228–29, 92 L.Ed. 210 (1948); *Brown v. United States,* 590 A.2d 1008, 1013 (D.C.1991); *Bailey v. United States,* 128 U.S.App.D.C. 354, 389 F.2d 305 (1967); *see also Michigan v. Summers, supra,* 452 U.S. at 696–97, 101 S.Ct. at 2590–91 (citing *Dunaway, supra,* 442 U.S. at 212, 99 S.Ct. at 2256–57); *Johnson v. United States,* 333 U.S. 10, 16–17, 68 S.Ct. 367, 370–71, 92 L.Ed. 436 (1947); *M.E.B., supra,* 638 A.2d at 1127 n. 2 (conceding the clear impropriety of seizing persons "for purposes of interrogation in the hopes that something incrimina-

ting will be elicited"). A second problem is that it renders the officers' subjective intent determinative of the issue whether a detention constitutes an arrest. The intrusive behavior of the police in this case is not made constitutionally permissible because the intent of the police was not to arrest, but merely to dispel or confirm their suspicion that Womack was a rapist. As the Court emphasized in *Michigan v. Summers, supra,* a case which permitted the detention of the occupant of a house pending the execution on the premises of a valid search warrant, "of prime importance" in permitting the temporary detention in that case was the fact that "[a] neutral and detached magistrate," rather than a law-enforcement officer whose goal was to develop evidence and apprehend suspects, "had found probable cause to believe that the law was being violated in that house." 452 U.S. at 701, 101 S.Ct. at 2593.

It is uncontroverted that the distinction between arrests and *Terry* stops does not depend on the subjective intent of the officers. *Keeter, supra,* 635 A.2d at 906 (reversing conviction as supported by evidence derived from unconstitutional seizure even where police had articulable suspicion and repeatedly told suspect that he was not under arrest) (citing *Gayden, supra,* 492 A.2d at 872); *Thompkins, supra,* 251 A.2d at 638 ("It is true that the point at which an arrest occurs is not controlled simply by when the arresting officer announces it.") (citations omitted); *see Davis v. Mississippi, supra,* 394 U.S. at 726, 89 S.Ct. at 1397 (rejecting the claim that seizures for investigatory purposes differ in their needed justification from seizures at the "accusatory stage"); *but see* Majority Opinion at 610 & note 11 (relying on police officer's subjective estimate that Womack was not placed under arrest until Womack had been identified). Womack's seizure, viewed from the perspective of any reasonable person in his circumstances, was likely indistinguishable from an arrest: awakened at the direction of the police, he was handcuffed immediately and forced outside and onto the street, with not an apparent chance to get dressed.

The Supreme Court has always maintained that the very premise of the permissible

*Terry* stop is that it is "*so substantially less intrusive* than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test." *Dunaway, supra,* 442 U.S. at 210, 99 S.Ct. at 2255 (emphasis added). A good indicator of whether a seizure was an arrest or a *Terry* stop must at least in part be whether the officers constrained themselves in the level of intrusion effected before probable cause developed. *In re M.E.B., supra,* 638 A.2d at 1128 ("In short, handcuffing the detainee, like length of detention, place of detention, and other considerations, is simply one factor, among many, that the trial judge must consider in weighing whether a detention for investigation crossed the line into the realm of arrest."). In this case there is no evidence on the record that suggests that the police did anything different than or restrained themselves from doing anything that they normally would have done in the course of an arrest.

The majority relies heavily on *In re M.E.B., supra,* 638 A.2d 1123. For reasons I have sought to identify in this discussion, *In re M.E.B.* presented circumstances so different on critical points from those presented here that its application to the present analysis is of questionable value, if it is of any. In *In re M.E.B.,* the police learned from a radio transmission that an individual matching the appellant's description was suspected of a homicide that had occurred just over one hour earlier. *Id.* at 1124. Police stopped the appellant and his companion on the street, at "a location consistent with the direction reportedly taken by the shooter when he left the scene." *Id.* at 1134. The police frisked the suspects, then handcuffed them in order to transport them ten to fifteen blocks for an identification procedure. *Id.* at 1125. Given the fact that there were only two officers detaining the two suspects, the location on a public street, and the officer's articulation of subjective fear that the homicide suspects would have an advantage traveling in the back of a police car which provided no protection for the officers, the court upheld the use of handcuffs. *Id.* at 1127. In that case, the record was replete with facts justifying this intrusion; in fact, the court explicitly relied in part upon the fact that the officers frisked the appellant before handcuffing him. *Id.*

Similar reasoning applied in *United States v. Bautista, supra.* The court relied on the officer's testimony in that case to identify the many facts which justified the use of handcuffs:

> At that time a robbery of the bank had been committed and I believed that they were possibly the suspects and also because I observed tracks on their arms related to use of narcotics and also it was for officer safety as a precaution. I knew I was going to go to the front door of a residence to verify their story and I'd be leaving my fellow officer partner, John Gaspar, alone with the suspects. And because the suspects appeared extremely nervous and suspect Bautista kept pacing back and forth and looking, turning his head back and forth as if he was thinking about running.

*Id.* at 1288. The court credited the testimony of the officer and found that the handcuffing of the suspects "was not unreasonable." *Id.* at 1289. The two suspects were to be left with one officer, the suspects would be in the back of the car, and they appeared to be "nervous;" thus, the government's facts justified the intrusion. *Id.* The officers' description of the circumstances surrounding the arrest was also central to the decision in *Reynolds v. Florida,* 592 So.2d 1082 (Fla. 1992). In that case, the court justified the use of handcuffs based upon the time of day ("night"), the location ("a neighborhood known for a high incidence of cocaine trafficking and use"), the officers' specific experience with drug-related arrests ("[a]n officer testified that she had been hurt in such a situation") and finally, on the underlying nature of the crime (cocaine distribution). *Id.* at 1085–86. Most importantly, the court specifically found that the use of handcuffs was proper when the facts demonstrated a reason to believe that the suspect was actually armed and dangerous. *Id.* at 1086.

In the present case, at least three officers were present when Womack was handcuffed. Although the law justifies *Terry* stops by

reference to a concern that the suspect be *currently* armed,[17] no police officer frisked Womack before he was removed from his home to the front yard, where additional officers were waiting in police cars. No officer articulated fear for his safety or thought that Womack might run. *See Hensley, supra,* 469 U.S. at 234–35, 105 S.Ct. at 683–84 (relying on officers' testimony that the suspect had been at large and was believed to be currently armed). There are no facts on the record in this case from which it could be inferred that the police even considered whether handcuffs were a necessary precaution in effecting this investigatory detention.

C. *The Government's Burden*

The government always bears the burden not only of proving that the circumstances in a particular case came within a recognized exception to the warrant requirement, *Sanders, supra,* 442 U.S. at 759–60, 99 S.Ct. at 2590–91 (citing *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951)), but also of proving that the subsequent search or seizure was, in fact, reasonable under the circumstances. *Id.* Even where the government is justifying a true *Terry* stop for an ongoing crime, "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1326; *see also Mayes v. United States,* 653 A.2d 856, 861 (D.C.1995) ("The prosecution was thus required to prove by a preponderance of the evidence that both the stop and the frisk were constitutionally permissible.").

This court has stated that lack of specificity or lack of evidentiary support for any intrusion, even a limited pat-down, during a *Terry* stop will render that intrusion illegal. *See Roy, supra,* 527 A.2d at 744 (holding investigative stop of five individuals illegal when based upon an inarticulable suspicion that one individual had been involved in a

crime). Once the government has presented some evidence justifying the stop, this court considers that evidence in light of the totality of the circumstances. *Anderson v. United States,* 658 A.2d 1036, 1037 (D.C.1995) (quoting *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990)). "Factors that may justify ... the escalated use of force include the time of day, the 'high-crime' nature of the area, an informant's tips that persons might be armed, furtive hand movements, flight or attempted flight by the person sought to be detained." *United States v. Laing,* 281 U.S.App.D.C. 266, 271, 889 F.2d 281, 286 (1989); *see also Cousart v. United States,* 618 A.2d 96, 100 (D.C.1992) (en banc) (stating that the fact that confrontation occurred in a high crime area was one factor to consider in determining whether the police used the least restrictive means under the circumstances) *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1878, 123 L.Ed.2d 496 (1993); *Minnick v. United States,* 607 A.2d 519 (D.C.1992) (partially relying upon officer's statement that confrontation occurred in "high narcotics area" in validating *Terry* search); *United States v. Taylor,* 716 F.2d 701, 709 (9th Cir. 1983) (justifying use of handcuffs during *Terry* stop where suspect refused to keep hands in the air and made furtive movements); *United States v. Purry,* 178 U.S.App.D.C. 139, 142, 545 F.2d 217, 220 (1976) (concluding that an officer's decision to handcuff defendant as part of an investigatory detention was justified because, when contacted within the area of an armed robbery minutes after the robbery occurred, defendant attempted to pull away from the officer). No one factor is dispositive in justifying the use of force. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 885–86, 95 S.Ct. 2574, 2582–83, 45 L.Ed.2d 607 (1975) (invalidating investigatory stops by border patrol officers based on a single factor).

Valid concern for the safety of the officers must be apparent from a fair reading of the

17. *See, e.g., Michigan v. Summers, supra,* 452 U.S. at 698, 101 S.Ct. at 2591–92; *Cousart v. United States,* 618 A.2d 96, 100 (en banc) (quoting Justice Harlan's concurrence in *Terry,* 392 U.S. at 33, 88 S.Ct. at 1886, that " '[t]here is no reason why an officer, rightfully but forcibly con-

fronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet' "), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1878, 123 L.Ed.2d 496 (1993).

evidence adduced before the trial court. *See id.* at 880, 95 S.Ct. at 2579–80 (holding that prior to a *Terry* stop, an officer must be able to identify " 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' a belief that his safety or that of others is in danger") (quoting *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1880); *In re M.M., supra,* 407 A.2d at 701 (noting that officer testified to his concern for safety in effecting a *Terry* frisk); *Crawford, supra,* 369 A.2d at 598–601 & n. 6 (quoting police testimony that officers believed that the suspect might be armed). The police officers must have an ongoing belief that the suspect whom they have encountered is both armed and potentially dangerous. *Powell, supra,* 649 A.2d at 1084 (D.C.1994) (quoting *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1879–80). In any event, police testimony describing the perceived necessity for handcuffs has been essential where the facts do not evidence a clear objective need for handcuffs. *Bautista, supra,* 684 F.2d at 1288 (relying on officer's restatement of facts justifying use of force in upholding the use of handcuffs during a *Terry* stop); *but see* Majority Opinion at 611 (noting without support in or reference to the testimony that the police officers in this case could not "foresee what a man suspected of armed rape and kidnapping might try to do to avoid apprehension. From their perspective, even a modest risk would reasonably appear altogether unacceptable"). It is with the government's burden in mind that this court should consider whether the record before it can adequately support the trial court's failure to suppress contested evidence.

### D. *The Role of the Reviewing Court*

It is elementary that a reviewing court is bound by the lower court's findings of fact, and should not engage in its own speculative fact-finding. *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc) (citing *Nixon v. United States,* 402 A.2d 816, 819 (D.C. 1979)). This court is bound to reverse decisions denying motions to suppress if the evidence presented does not adequately support the motions court's findings of fact and conclusions of law. *Powell, supra,* 649 A.2d at 1088–90. In this case, the motions court made no finding as to the necessity for hand-

cuffs, and only ruled that Womack was arrested after the show-up identification. That failure alone should prompt this court at least to remand the case for additional findings regarding the basis of the police's alleged need to handcuff a suspect under the circumstances as they appeared to the officers.

The majority does not identify any facts articulated by the police or found by the motions court as the basis for justifying the use of handcuffs. Without any support in the record, the majority assumes that the police officers were in a particularly dangerous situation because they were on Womack's "home turf," were not acquainted with Womack or his family, and "had no idea where his gun might be, or whether there were other individuals on the scene." *See ante* at 610–611. The majority further has decided to fill in the gaps in the government's presentation and the court's findings because, in the majority's opinion, the fact that the police were investigating a violent rape and burglary made it "obvious" that it would be dangerous to try to deal with Womack without handcuffs. *See id.* at 614. In so doing, the majority has exceeded its role, deducing facts that were never elicited in the trial court, and thus relieving the government of its legal burden. Our proper role is to review the facts of record and all reasonable inferences therefrom in favor of sustaining the trial court's ruling. It is not our role to boost the government's case. Rather, because the government knows that it bears the burden to meet an exception to the warrant requirement, and had a fair opportunity to do so in the trial court, "[t]he fact that the government failed to present more evidence than it did only suggests to us that the government has exhausted the evidence favorable to its position." *Stewart v. United States,* 668 A.2d 857, 868 (D.C.1995).

Ironically in light of Supreme Court precedent stressing that persons in the home deserve maximum Fourth Amendment protection, one major justification the majority advances for handcuffing Womack in this case is that the officers encountered him in his home. In this case, the officers chose the time and circumstances of the encounter;

the number of officers at Womack's home and the number of squad cars that were present reflects this preparation. *Compare Hensley, supra,* 469 U.S. at 229, 234–36, 105 S.Ct. at 680–81, 683–84 (affirming conviction where suspect had been admittedly wanted for questioning for some time, and was fortuitously spotted driving through town with another known felon; court explicitly relied on the police's prior inability to locate the suspect) *with Davis, supra,* 394 U.S. at 727–28, 89 S.Ct. at 1398 (reversing conviction where police effected an alleged *Terry* stop of suspect to obtain fingerprint samples, which constituted a procedure that "need not come unexpectedly or at an inconvenient time"); *see also Hensley, supra,* 469 U.S. at 228–29, 105 S.Ct. at 680 (noting that "officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop"). Particularly where the officers have chosen to look for a suspect in his house, without first obtaining a warrant, this court should hesitate to allow the location of the so-called *Terry* "stop" in a home as a factual basis to demonstrate that the encounter was accompanied by *Terry*-like exigencies.

If *Terry* is going to provide the justification for a seizure in the home, this court should require—as it always has under *Terry*—identification of specific facts about the suspect's conduct and articulated concerns about the setting, which required the police to engage in the presumptively unlawful conduct. The fact that the seizure occurred in Womack's home in this case is a factor that undermines, rather than helps justify, the police's use of handcuffs under the circumstances presented in this case. Womack appears, from this record, to have been a remarkably sedentary suspect, returning home after an armed rape to go to bed. When called downstairs by his grandmother, Womack dutifully obeyed. The facts of this case stand in stark contrast to the half-mile vehicular pursuit of a suspect who had been seen "hastily" entering and leaving a convenience store that led the Supreme Court to employ the language—quoted out of context by the majority in this case—that "[t]he calculus of reasonableness must embody allowance for

the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) *quoted ante* at 607. This would be a far different case if the police officers had testified in the trial court to having experienced any tension or uncertainty, or *to having actually thought about and determined that the amount of force they used on Womack was necessary.* There is no indication in this record that the officers believed that the use of handcuffs was the least intrusive means reasonable under the circumstances. Further, I note that to the extent that the situation was, in fact, a "rapidly evolving" one, such circumstances are attributable neither to chance nor to Womack, who had been asleep, but are attributable to the police officers' having employed an investigative technique—direct confrontation and seizure in the absence of probable cause, without recourse to further investigation or obtaining a warrant—that courts have traditionally deemed to be unconstitutional, or, to be constitutional, necessarily based on articulated factual justification.

It is difficult to understand, in light of the number of officers and the circumstances of their encounter with Womack, why handcuffs would be considered necessary or reasonable. While officers conceivably might feel apprehensive confronting a suspect in his home, the government in this case can offer no explanation as to why, if that were so, the officers did not frisk Womack before handcuffing him—except that it was clear that Womack was not armed. *See In re M.E.B.,* 638 A.2d at 1127 (relying in part on the "undisputed [fact] that the police followed their usual practice and frisked both appellant and [his accomplice] before they were handcuffed" in upholding valid *Terry* stop); *Powell, supra,* 649 A.2d at 1088 (reversing conviction under *Terry* where despite trial court's finding that officers acted reasonably, "if the officers feared for their safety, they certainly did not act in a manner suggesting apprehension of harm"). Indeed, no facts in

this record should lead police to believe that Womack might currently be armed. *See Anderson, supra,* 658 A.2d at 1038–40 (citing cases, including *United States v. Barnes,* 496 A.2d 1040 (D.C.1985); *Peay, supra,* 597 A.2d 1318; *Duhart v. United States,* 589 A.2d 895 (D.C.1991); and *Curtis v. United States,* 349 A.2d 469 (D.C.1975)); *Crowder v. United States,* 379 A.2d 1183, 1185 (D.C.1977). No officer alluded to having feared for his safety; the absence of such evidence traditionally has led this court to reverse trial court decisions not to suppress. *Compare Powell, supra,* 649 A.2d at 1084–85 (reversing conviction where officer had testified only that one fact relied on in effecting *Terry* stop was the suspect's turn into an alley, but trial court went further and characterized turn as "unusual") *with Barnes, supra,* 496 A.2d at 1041 (validating *Terry* frisk where officer had factual reason to believe that suspect might be armed).

In sum, with no indicia of danger to the officers, no attempt to flee, and no evidence or testimony supporting the use of handcuffs, the majority engages in precisely the type of after-the-fact armchair musing it criticizes: *de novo* fact-finding to justify its reasoning where the government has failed to prove its case. *See, e.g.,* Majority Opinion at 611 (observing without support in the record that the officers feared that other persons on the scene "might endeavor to thwart [Womack's] apprehension"); *but see Powell, supra,* 649 A.2d at 1084–86 (reversing conviction where trial court's *Terry* consideration of furtive movements was not supported in the record). For example, the majority notes that it was reasonable for the police to handcuff Womack before taking him outside, because it would have been easier to escape from the porch. There is no evidence that the porch would have provided a better path to an escape allegedly contemplated by Womack; in fact, Womack was shoeless, and there were several police cars in front of the home.

Stripped of the majority's unsupported post-hoc rationalizations, the one justification advanced by the majority that is supported by the record is that the officers were investigating a violent crime. *Cf. Oliver, supra,* 656 A.2d at 1167 n. 15. I cannot believe that the nature of the crime, without more, can validate an otherwise unlawful seizure. *See Keeter, supra,* 635 A.2d at 904 (reversing conviction on Fourth Amendment grounds where suspect was detained on reasonable suspicion that he had committed a homicide). Insofar as the underlying crime could possibly have led the officers to fear for their safety, the ensuing facts in the record should have substantially obviated the necessity for this intrusion. *See Ybarra v. Illinois,* 444 U.S. 85, 92–93, 100 S.Ct. 338, 342–43, 62 L.Ed.2d 238 (1979) (finding that the actions of the suspect during the stop did not even justify a frisk for weapons); *Terry, supra,* 392 U.S. at 30, 88 S.Ct. at 1884 (stating that even a limited frisk for weapons is justified only when "nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety"). The officers testified that they were allowed into the house with little opposition from Womack's grandmother. The grandmother summoned Womack, who appeared in "sleeping attire" consisting only of shorts and a t-shirt. Before questioning Womack and without frisking him, the officers handcuffed him and removed him from his home. There is no evidence that before they handcuffed him, the police thought that Womack appeared nervous, mounted any resistance, or made any threats to the officers. *Cf.* Majority Opinion at 609 (correctly noting that "[c]ourts have routinely held the use of handcuffs in the *Terry* context to be reasonable in situations where suspects attempted to resist police, made furtive gestures, ignored police commands, attempted to flee, or otherwise frustrated police inquiry") (citations omitted).

It is difficult to conceive of any confrontation between an officer and a suspect of a violent crime—rape, robbery, homicide, kidnapping—where handcuffing would not be reasonable by the majority's rule. It is without question that police officers must be allowed to take steps necessary to protect themselves. However, the use of any intrusive measure must hinge upon more than the nature of the underlying crime. The bare assertion that the circumstances described in the majority opinion "*could* lead a reasonably prudent police officer to believe that ... the most reasonable course of action would be to

**631**

handcuff Womack," does not establish the particular factual basis for the use of handcuffs in this case. I believe that the *Terry* standard, requiring the government to state particular facts necessitating the use of handcuffs, was not met in this case. As Justice Brennan stated in *Royer, supra,* "[w]e must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies" in disregard of the Fourth Amendment. 460 U.S. at 513, 103 S.Ct. at 1332 (Brennan, J., concurring) (quoting *Coolidge v. New Hampshire, supra,* 403 U.S. at 455, 91 S.Ct. at 2032). Although I agree with the majority that the police need to be able to investigate violent crime, the Fourth Amendment requires that we balance the investigative means used by the police against protections provided by the Constitution to an individual whom the police do not have probable cause to arrest.

### III.

In sum, I dissent from the majority opinion for several reasons. Because this investigative "stop" took place in Womack's home several hours after the underlying crime had been completed, the scope of the seizure should have been carefully circumscribed, even if the initial entry into the home was consensual. The government in this case failed to meet its burden of demonstrating that the level of intrusiveness was necessary, because it did not state any facts justifying the use of handcuffs.

A finding that Womack was illegally seized does not, in my view, demand reversal. Instead, this case should have been remanded for a finding whether the evidence sought to be suppressed was a "fruit" of the illegality. *See United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (considering identification as a fruit of illegality). Womack sought to suppress the show-up identification by the victim, clothing and footwear seized at the scene, and statements made to an officer later that evening. Much of this evidence might be admissible in spite of the illegality, if the government could prove that it would have been inevitably discovered, or if it were free of the taint of illegality. *See Nix v. Williams,* 467 U.S. 431,

104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *New York v. Harris, supra,* 495 U.S. at 18–20, 110 S.Ct. at 1643–44; *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The current record regarding which evidence derived from the initial seizure is inadequate for this court to make that determination. Thus, I would remand this case, and not yet reverse or affirm Womack's multiple convictions.